1

2

3

4

5

6

7

8                          IN THE UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10   DARIN DEMETRIUS GREENE,

11              Plaintiff,                          No. CIV S-04-0917 MCE DAD P

12        vs.

13   SOLANO COUNTY JAIL, et al.,              <u>ORDER AND</u>

14              Defendants.                   <u>FINDINGS & RECOMMENDATIONS</u>

15   _____/

16              Plaintiff, a former inmate of the Claybank facility at the Solano County Jail, has

17   filed a civil rights action.  This matter is before the court on defendant Peggy Rourk's motion for

18   summary judgment.

19                                  BACKGROUND

20              On May 10, 2004, this case was transferred to this court from the U.S. District

21   Court for the Northern District of California.  On May 13, 2004, the court ordered plaintiff to file

22   an amended complaint because he had failed to sign his complaint.  On May 26, 2004, plaintiff

23   filed his amended complaint naming Solano County Sheriff's Lt. Peggy Rourk as the sole

24   /////

25   /////

26   /////

                                          1

1    defendant in this action.[1]   Defendant Rourk is the commander of the Claybank facility of the

2    Solano County Jail where plaintiff was incarcerated while awaiting trial on felony charges for

3    terrorist threats and false imprisonment.  (Decl. of Peggy Rourk in Support of Mot. for Summ. J.

4    (Rourk Decl.)[2], ¶¶ 1, 9 at 1, 3; Suppl. Decl. of Stringer in Support of Mot. for Summ. J., Ex. A

5    (Excerpts of Pl.'s Dep.)[3] at 3.)  Plaintiff's period of incarceration at Claybank facility was

6    approximately three months, from June 30, 2003 to October 9, 2003.  Thereafter, following his

7    conviction, plaintiff was transferred from the Solano County Jail Claybank facility to San

8    Quentin State Prison.  (Pl.'s Decl.[4], filed 11-16-05, ¶ 2, at 1; Rourk Decl. ¶ 11, at 3.)

9            In his amended complaint, plaintiff claims that while detained at the county jail he

10   was not allowed to attend religious services because he was a maximum security inmate.

11   (Compl. at 3.[5])  Plaintiff alleges that he was told that only minimum and medium security

12   inmates are allowed to attend religious services because of staffing limitations.  (Id.)  Plaintiff

13   attempted to conduct Bible studies and morning prayer with other inmates from within their

14   respective cells by yelling through the corner edge of the cell door, but this was discontinued

15   when other inmates complained about the noise.  (Id. at 4.)  On September 12, 2003, plaintiff

16

17        [1]  On May 27, 2004, plaintiff filed a duplicate copy of his amended complaint.  In the
     court's August 18, 2004 order, the court advised plaintiff that the May 27 amended complaint
18   would be disregarded and that the amended complaint filed on May 26 is the operative complaint
     for this action.

19        [2]  Court document number 42, Part 1 is defendant Rourk's declaration (Rourk Decl.).

20        [3]  Court document number 45, Part 2, Ex. A is excerpts of plaintiff's deposition (Excerpts
     of Pl.'s Dep.).  In referring to page numbers from the excerpts, the court will use the page
21   numbers assigned by the court's Case Management/Electronic Case Files system (CM/ECF).

22        [4]  Court document number 56 is plaintiff's declaration in support of his opposition to
     defendant's motion for summary judgment (Pl.'s Decl.).
23

24        [5]  Court document number 5 is plaintiff's amended complaint, filed on May 26, 2004.
     The four-page, amended complaint consists of three pages of a form complaint (numbered page
25   6, page 7, and page 8), and one typed page which is not numbered.  To avoid confusion, the court
     will use the page numbers assigned by the court's Case Management/Electronic Case Files
26   system (CM/ECF).  Therefore, the first page of plaintiff's amended complaint will be cited as
     page 1 (rather than page 6), and the pages thereafter are numbered in numerical order.

1  submitted a grievance signed by 42 other inmates, and requested that group religious services be

2  provided for maximum security inmates.  (Id.)  Defendant Lt. Rourk responded to the grievance

3  and offered visitation by religious leaders or the chaplain on staff.  (Id.)  On September 19, 2003,

4  plaintiff submitted a second grievance complaining that the chaplain had not come to his module

5  and requesting that a classroom be made available for maximum security inmates to participate

6  in religious programs.  (Id.)  The grievance and request was denied by defendant Lt. Rourk.  (Id.)

7  Plaintiff contends that the refusal to provide religious programs and the denial of the ability to

8  assemble by defendant is not due to concerns about riots or disorderly conduct, but because of

9  the "job functions of custody staff[.]"  (Id.)  Plaintiff contends that when he was transferred to the

10  main jail in Fairfield, California, he spoke to a Bible-study volunteer and was told that volunteers

11  have offered to conduct bible studies for maximum security inmates and agreed to sign release of

12  liability agreements, but that such efforts had been rejected by jail officials.  (Id.)  Plaintiff claims

13  that he has suffered discriminatory treatment, been denied "access to free assembly for religious

14  services and practices," and subjected to cruel and unusual punishment in violation of the First,

15  Eighth and Fourteenth Amendments.  (Id.)  Plaintiff seeks the following relief:

16      End Solano Counties [sic] discriminitory [sic], prejudicial and
    unconstitutional practice of denying inmates "equally" to religious
17      services, Bible study.  Monitor there [sic] policies to ensure equal
    and fair treatment to all individuals in there [sic] custody.  Award
18      twenty million dollars to me for pain and suffering, for the cruel
    and unusual punishment, and for the mental anguish and distress.
19      Portions of the twenty million dollars will be given to the (42) forty
    two individuals listed on the back of the original greivance [sic]
20      with my being responsible for doing so after and if any monies are
    awarded to me.[6]  Force a public apology.

21

22  /////

23  /////

24  ───────────────

25      [6] Defendant has argued that plaintiff cannot represent the 42 other inmates.  In his
opposition to the motion for summary judgment, plaintiff contends that he is proceeding as the
26  sole plaintiff in this action and makes clear that he is not attempting to represent other inmates.
(Pl.'s P&A, filed 11/16/05, at 12.)

1    (Id.)  In his opposition to defendant's motion for summary judgment, plaintiff concedes that his

2    request for injunctive relief is now moot since he is no longer incarcerated at the Solano County

3    Jail.  (Pl.'s Mem. P&A in Opp'n to Mot. for Summ. J. (Pl.'s P&A)[7], filed 11/16/05, at 12.)

4                                    THE PARTIES' ARGUMENTS AND EVIDENCE

5    I.  Defendant's Motion for Summary Judgment

6                Defendant asserts that under the Religious Land Use & Institutionalized Persons

7    Act of 2000 (RLUIPA), the government may substantially burden a person's exercise of religion

8    only if there is a compelling governmental interest and it is the least restrictive alternative.

9    (Def.'s Mem. P&A (Def.'s P&A)[8], filed 9/27/05, at 5.)  Based on security concerns, defendant

10   contends that group religious services for maximum security inmates would pose a risk to prison

11   staff, other inmates and the public.  (Id. at 5-6.)  According to defendant, there is only one

12   classroom at the Claybank facility and it is located on the minimum security level of the

13   institution.  (Id. at 6.)  Only one rover security guard is available for assignment to the maximum

14   security modules for each shift.  (Id.)  Accordingly, if that guard were to be required to escort a

15   group of maximum security inmates to the classroom for religious services, the other inmates

16   housed in maximum security would be without supervision.  (Id.)  Defendant argues that such

17   decisions by jail administrators regarding the day-to-day operations of the facility should be

18   accorded deference.  (Id.)

19                Defendant Rourk also argues that she is entitled to qualified immunity.  (Id at 8.)

20   She argues that jail staff provided plaintiff with a Bible and religious periodicals, and that

21   plaintiff was advised that he could request a visit from a religious leader.  (Id. at 9.)  Plaintiff did

22   not request such visitation.  (Id.)  Defendant asserts that she believed that the denial of group

23

24        [7]  Court document number 57 is plaintiff's November 16, 2005 memorandum of points
     and authorities in opposition to defendant's motion for summary judgment (Pl.'s P&A).

25

26        [8]  Court document number 40 is defendant's memorandum of points and authorities
     (Def.'s P&A).

1   religious services for maximum security inmates was necessary for security and safety reasons,

2   and that it was the least restrictive alternative.  (<u>Id.</u> at 10.)

3          Defendant Rourk has submitted a declaration providing further information

4   regarding the security concerns implicated by group religious services for maximum security

5   prisoners at the Claybank facility.  In this regard, defendant contends that the minimum and

6   medium security inmates at Claybank may use the classroom located on the minimum security

7   floor because they do not pose a threat to jail security.  (Rourk Decl. ¶ 7, at 2.)  Those prisoners

8   are housed in a dorm-like setting; however, maximum security inmates are housed in two-person

9   locked cells with 10 cells to a module.  (<u>Id.</u>)  Plaintiff was housed in the maximum security unit

10  at Claybank because he was a pre-trial detainee charged with the felony offenses of making

11  terrorist threats and false imprisonment.  (<u>Id.</u> ¶ 9, at 3.)

12  II.  <u>Plaintiff's Opposition</u>

13         Plaintiff disputes certain facts identified by defendant Rourk as undisputed.  For

14  instance, plaintiff disputes that inmates housed in maximum security at the Claybank facility

15  cannot meet in a group setting for security reasons.  (Pl.'s P&A, at 4.)  Plaintiff contends that he

16  will prove at trial that "inmates from maximum security were taken to the law library classroom

17  in groups at least once a week, left unattended and unsupervised for 1 to 2 hours at a time to do

18  legal research, in a group setting, without incident nor problems."  (<u>Id.</u>)  Plaintiff argues that the

19  law library classroom could have been used for the group religious services.  (<u>Id.</u> at 5.)  Plaintiff

20  also disputes defendant's assertion that he never requested to see a chaplain.  Plaintiff explains

21  that since clergy are subject to the regulations and policies relating to visitation, it would have

22  been difficult for him to request a religious visit since he was not from the area and would have

23  had difficulty locating a local clergyman.  (<u>Id.</u> at 6.)  Finally, plaintiff argues that pursuant to

24  California Penal Code § 4014, defendant could have obtained extra/temporary guards at county

25  /////

26  /////

1    expense.[9]  (Id. at 7.)  Based on RLUIPA, the Equal Protection Clause of the Fourteenth

2    Amendment, the Eighth Amendment, and California Penal Code § 4027[10], plaintiff argues that

3    his right to group religious worship was violated by defendant's conduct.  (Id. at 4, 8-11.)

4              In his own declaration, plaintiff states that he attempted to hold religious services

5    with other Christian inmates in the H module of the maximum security unit, but the studies were

6    stopped by jail officials because the services interrupted day room activities and in order "to

7    prevent any physical altercations with other co-habitants within that module."  (Pl.'s Decl. ¶ 5, at

8    1.)  Plaintiff also asserts that the law library classroom which is "down the hall from maximum

9    security" could be used for group religious worship.  (Id. ¶¶ 10 & 16, at 2.)  Plaintiff repeats his

10   claim that at least once a week, maximum security inmates are escorted to that classroom in

11   groups and left unattended for up to two hours.  (Id. ¶¶ 11-12, at 2.)  Plaintiff contends that he

12   filed a grievance and requested that religious leaders be sent to conduct services and studies for

13   maximum security inmates, but that he never asked for a "religious 'visit'."  (Id. ¶¶ 13-14, at 2.)

14   Plaintiff also contends that when he was held at the main jail, a volunteer told plaintiff that he

15   "wanted to minister to inmates in maximum security."  (Id. ¶ 19, at 2.)

16   III.  Defendant's Reply

17             Defendant argues that plaintiff has failed to file a concise statement of disputed

18   facts and that the only evidence plaintiff relies upon is his own declaration which does not raise

19   any genuine issue for trial.  Rather than disputing defendant's contention that for security reasons

20   group services for maximum security inmates at Claybank are not conducted, defendant contends

21   /////

22

23        [9]  California Penal Code § 4014 provides:  "The sheriff, when necessary, may, with the
     assent in writing of the county judge, or in a city, of the mayor thereof, employ a temporary guard

24   for the protection of the county jail, or for the safekeeping of prisoners, the expenses of which are
     a county charge."

25        [10]  California Penal Code § 4027 provides:  "It is the intention of the Legislature that all
     prisoners confined in local detention facilities shall be afforded reasonable opportunities to

26   exercise religious freedom."

                                                      6

1  that plaintiff's own declaration confirms the necessity for the policy.  (Def.'s Reply[11], filed

2  11/21/05, at 2.)  In this regard, defendant points out that plaintiff himself has conceded that Bible

3  studies in the maximum security module at Claybank had to be halted to prevent physical fights

4  with other inmates who were participating in day room activities.  (Id.)

5          Defendant also argues that plaintiff's reliance on various California Penal Code

6  provisions is misplaced.  Defendant notes that Penal Code § 4029 merely requires equal facilities

7  for men and women in county detention facilities; Penal Code § 4002 does not require

8  fraternization between pre-trial detainees and convicted prisoners; and Penal Code § 4014 does

9  not require the employment of temporary guards to escort maximum security prisoners to group

10 religious services.  (Id. at 2-3.)  Finally, defendant argues that Penal Code § 4027 merely

11 expresses the intent of the California Legislature that all prisoners be afforded reasonable

12 opportunities to exercise their religion, but does not mandate group religious services for

13 maximum security jail inmates in the face of legitimate security concerns.  (Id.)  Defendant

14 contends that plaintiff had other means for exercising his religious freedom, such as reading,

15 praying or meditating on his own, or requesting a private religious visit.  (Id.)

16          As to plaintiff's argument that the jail law library was available for group

17 religious services, defendant asserts that plaintiff does not appreciate the intricacies of operating

18 a jail while ensuring the security of staff and the public.  (Id. at 4.)  Defendant argues that

19 pursuant to Whitley v. Albers, 475 U.S. 312, 321 (1986), deference should be accorded to jail

20 staff and their decisions to adopt and execute policies and practices needed to preserve order and

21 discipline and maintain institutional security.  (Id.)  In her declaration in support of her reply,

22 defendant Rourk states that the law library, located down the hall from the maximum security

23 unit, has never been used as a classroom and that maximum security inmates are "escorted one at

24

25         [11]  Court document number 59 is defendant's November 21, 2005 memorandum of points
   and authorities in reply to plaintiff's opposition to defendant's motion for summary judgment
26 (Pl.'s Reply).

1  a time by a 'rover' guard to the law library and they are locked in the library for up to one hour at

2  a time.  Only one inmate at a time is permitted to be in the law library."  (Def.'s Decl. in Support

3  of Def.'s Reply (Pl.'s Reply Decl.)[12], filed 11/21/05, at 2.)

4           Lastly, defendant Rourk argues that based on the allegations of the amended

5  complaint, plaintiff made clear that she is being sued only in her official capacity.  (Id. at 5.)

6  Defendant Rourk asserts that plaintiff has not raised a triable issue as to qualified immunity in

7  that he has not shown that her conduct was clearly unlawful or that no reasonable person in her

8  position would have understood that her actions were unlawful.[13]  (Id.)

9                    SUMMARY JUDGMENT STANDARDS UNDER RULE 56

10          Summary judgment is appropriate when it is demonstrated that there exists "no

11  genuine issue as to any material fact and that the moving party is entitled to a judgment as a

12  matter of law."  Fed. R. Civ. P. 56(c).

13          Under summary judgment practice, the moving party

14          always bears the initial responsibility of informing the district court
            of the basis for its motion, and identifying those portions of "the
15          pleadings, depositions, answers to interrogatories, and admissions
            on file, together with the affidavits, if any," which it believes
16          demonstrate the absence of a genuine issue of material fact.

17  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).  "[W]here the

18  nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary

19  judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers

20  to interrogatories, and admissions on file.'"  Id.  Indeed, summary judgment should be entered,

21  after adequate time for discovery and upon motion, against a party who fails to make a showing

22  sufficient to establish the existence of an element essential to that party's case, and on which that

23  party will bear the burden of proof at trial.  See id. at 322.  "[A] complete failure of proof

24  _____

25          [12]  Court document number 62 is defendant Rourk's November 21, 2005 declaration.

26          [13]  Resolution of defendant Rourk's claim of entitlement to qualified immunity is not
        necessary in disposing of her motion for summary judgment.

concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.  In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists. See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if

1   any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson,

2   477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the

3   court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.

4   Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to

5   produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen

6   Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir.

7   1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply

8   show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

9   as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

10  'genuine issue for trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

11          On August 18, 2004, the court advised plaintiff of the requirements for opposing a

12  motion pursuant to Rule 56 of the Federal Rules of Civil Procedure.  See Rand v. Rowland, 154

13  F.3d 952, 957 (9th Cir. 1998) (en banc),  cert. denied, 527 U.S. 1035 (1999), and Klingele v.

14  Eikenberry, 849 F.2d 409 (9th Cir. 1988).

15                          DISCUSSION[14]

16  I.  First Amendment Claim

17          "[P]risoners do not forfeit all constitutional protections by reason of their

18  conviction and confinement in prison."  Bell v. Wolfish, 441 U.S. 520, 545 (1979).  They "retain

19  protections afforded by the First Amendment, including its directive that no law shall prohibit the

20  free exercise of religion.  O'Lone v. Estate of Shabazz, 482 U.S. 342, 348 (1987).  See also Cruz

21

22          [14]  In his amended complaint, plaintiff alleges violation of his rights under the First,
23  Eighth and Fourteenth Amendments.  In his opposition to defendant Rourk's pending summary
    judgment motion, plaintiff also claims violations of RLUIPA and California Penal Code § 4027.
24  Although plaintiff's amended complaint does not specifically cite RLUIPA or Penal Code §
    4027, the factual allegations of the pro se pleading may be liberally construed as stating such
25  claims.  Accordingly, all of plaintiff's arguments in opposition to defendant's motion for
    summary judgment will be considered and addressed herein.  See Karim-Panahi v. Los Angeles
26  Police Dept., 839 F.2d 621, 623 (9th Cir. 1988) (holding that the court must liberally construe a
    pro se plaintiff's complaint).

1   v Beto, 405 U.S. 319, 322 n.2 (1972).  However, this right to exercise one's religion "is

2   necessarily limited by the fact of incarceration, and may be curtailed in order to achieve

3   legitimate correctional goals or to maintain prison security."[15]  O'Lone v. Estate of Shabazz, 482

4   U.S. at 348.  See also Turner v. Safley, 482 U.S. 78, 89-91 (1987).

5          The United States Supreme Court has established the following standard for

6   balancing a prisoner's constitutional rights with legitimate correctional goals:  "[W]hen a prison

7   regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably

8   related to legitimate penological interests."  Turner, 482 U.S. at 89.  When an inmate challenges

9   a regulation and correctional officials seek to justify the regulation on the basis of a legitimate

10  penological interest, the court must determine whether the regulation is reasonably related to the

11  penological interest asserted.  Id.  In making such a determination, courts consider four factors:

12          First, there must be a valid, rational connection between the prison
            regulation and the legitimate governmental interest put forward to
13          justify it, and the governmental objective itself must be a legitimate
            and neutral one.  A second consideration is whether alternative
14          means of exercising the right on which the regulation impinges
            remains open to prison inmates.  A third consideration is the
15          impact accommodation of the asserted right will have on guards,
            other inmates, and the allocation of prison resources.  Finally, the
16          absence of ready alternatives is evidence of the reasonableness of a
            prison regulation.

17

18  Allen v. Toombs, 827 F.2d 563, 567 (9th Cir. 1987) (citing Turner, 482 U.S. at 89-91).  See also

19  O'Lone, 482 U.S. at 349-50.

20          Here, defendant has presented evidence that staffing and security concerns

21  prohibit group religious services at the Claybank facility for maximum security inmates at that

22  jail.  Defendant Rourk has provided a declaration explaining that only one security guard is

23  available for each shift to escort maximum security inmates, that if the escort guard had to stay to

24

25          [15]  The First Amendment, made applicable to the states by the Fourteenth Amendment,
        prohibits the making of laws "respecting an establishment of religion, or prohibiting the free
26      exercise thereof."  U.S. Const. amend. I.

supervise the religious services which plaintiff proposes, the other maximum security inmates in the housing area would be left completely unsupervised.  Plaintiff contends that maximum security inmates can peacefully function in group settings without incident and that at least once a week, maximum security inmates are left unsupervised in the law library classroom.  Plaintiff states that at trial, he will present evidence to support these contentions.  However, in order to defeat summary judgment, plaintiff is required to present evidence establishing a disputed issue of material fact.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.   Plaintiff's mere assertion that maximum security inmates do not pose a security risk is both insufficient and unsupported by any evidence before the court.  Indeed, plaintiff's assertion would appear to be at odds with his own deposition at which he testified as follows:

> Q [Defendant's Counsel].  But at Clay Bank you did see fights up in your mod?
>
> A [Plaintiff].  Oh, yeah.
>
> Q.  Did they happen every day?
>
> A.  No, not every day.  Verbal confrontations every day, people always yelling and cursing at each other and threatening and so forth and rallying up and wanting - - wanting to fight but never really went forward.  This was - - like - - maybe every two weeks or something like that you'd see, you know, youngsters fighting, you know.  And the group - - I mean - - a lot of the people in max 2, they're there for a few minutes, you know.  It's not like okay, you're here for a minutes and then you're going to medium or minimum; you know, the majority of the people there stayed.  So we got on - - you known - - know one another or be around one another to know each others' moods and all of the craziness and how people are, you know.
>
> Q.  Did you feel that being in maximum security was an unsafe place to be?
>
> A.  Actually, you know, I can say yeah, because - - I mean - - I consider myself as a woos [sic], you know, when it comes to being in - - you know, I get along with people but I don't go - - I don't fight people, you know.  That's not my cup of tea, you know.

/////

/////

1   (Excerpts of Pl.'s Dep., at 15-16.)  Thus, under the first prong of the <u>Turner</u> analysis, the

2   limitation on plaintiff's attendance at group religious services appears logically related to

3   defendant's legitimate concerns for safety and the orderly administration of the jail.

4          As to the second <u>Turner</u> factor, it appears undisputed that alternate means for

5   exercising his religion remained available to plaintiff.  Plaintiff was provided religious reading

6   materials and was free to request a personal visit with a chaplain.  However, plaintiff never

7   submitted a request form seeking a religious visit.[16]  In this regard, the court is not persuaded by

8   plaintiff's argument that he could not ask for a visitation since he was not from the area and did

9   not know any local clergy.  (<u>See</u> Pl.'s P&A, at 6.)  Plaintiff has not demonstrated that the jail

10  policy was unreasonable because alternate means for exercising his religion was unavailable.

11         Next, the likely impact of accommodating plaintiff's request on jail staff, other

12  detainees and the general allocation of jail resources is another factor which weighs in favor of

13  defendant.  The defendant's explanation that the unavailability of jail staff to escort and supervise

14  maximum security inmates and concerns about the security of staff and inmates is a reasonable

15  justifications for the policy and plaintiff has failed to point to any readily feasible alternative that

16  could be implemented at an achievable cost while still addressing the legitimate security

17  concerns of jail officials.  <u>Cf.</u> <u>Turner</u>, 482 U.S. at 90-91.

18         Finally, the United States Supreme Court has cautioned that policies and

19  regulations related to prison security "'are peculiarly within the province and professional

20  expertise of corrections officials, and, in the absence of substantial evidence in the record to

21  indicate that the officials have exaggerated their response to these considerations, courts should

22  ordinarily defer to their expert judgment in such matters.'"  <u>Turner</u>, 482 U.S. at 86 (quoting <u>Pell</u>

23  <u>v. Procunier</u>, 417 U.S. 817, 827 (1974)).  Absent any contrary evidence, it is inappropriate to

24  second-guess jail officials as to whether maximum security inmates pose a security risk, whether

25  _____

26      [16]  During his deposition, plaintiff confirmed that he never filled out an inmate request form to ask for a religious visit.  (Excerpts of Pl.'s Dep., at 13.)

1  additional staff should be hired, and whether the jail law library could be used for religious

2  services.[17]

3          Summary judgment should be granted in favor of defendant Rourk with respect to

4  plaintiff's First Amendment Free Exercise claim.

5  II.  RLUIPA Claim

6          Pursuant to 42 U.S.C. § 2000cc-1, RLUIPA provides:

7          No government shall impose a substantial burden on the religious
        exercise of a person residing in or confined to an institution . . .,
8        even if the burden results from a rule of general applicability,
        unless the government demonstrates that imposition of the burden
9        on the person - -

10          (1) is in furtherance of a compelling government interest; and

11          (2) is the least restrictive means of furthering that compelling
        government interest.

12

13  RLUIPA replaces the "legitimate penological interest" standard articulated in Turner v. Safley,

14  with a "compelling governmental interest" and "least restrictive means" tests.  Warsoldier v.

15  Woodford, 418 F.3d 989, 994 (9th Cir. 2005).  For purposes of RLUIPA, "religious exercise"

16  includes "any exercise of religion, whether or not compelled by, or central to, a system of

17  religious belief."  42 U.S.C. § 2000cc-5(7)(A).  The statute must be "construed in favor of a

18  broad protection of religious exercise, to the maximum extent permitted" by the Act and the

19  Constitution.  42 U.S.C. § 2000cc-3(g).  Individuals may assert a violation of RLUIPA as a claim

20  or defense in judicial proceedings and obtain appropriate relief.  42 U.S.C. § 2000cc-2(a).

21          Under RLUIPA, plaintiff bears the burden of demonstrating that the jail policy

22  places a substantial burden on the exercise of his religious beliefs.  Warsoldier, 418 F.3d at 994.

23  The focus of this initial inquiry is therefore on how plaintiff's religious exercise is impacted,

24

25          [17]  Even if the law library space was available for group religious services defendant's
    legitimate security and staffing concerns would remain unaddressed.

26

14

1   rather than on the reasonableness of the facility's policy or regulation.  If the plaintiff establishes

2   a prima facie case of a substantial burden on the exercise of his religion, the burden shifts to the

3   defendant to prove that any substantial burden is both in furtherance of a compelling

4   governmental interest and is the least restrictive means for furthering that compelling

5   governmental interest.  Id. at 995.

6           While RLUIPA does not define the term "substantial burden," the following

7   analysis provides some guidance:

8           Because RLUIPA is a statute of relatively recent vintage, there is
            little precedent interpreting its key terms.  However, because the
9           Religious Freedom Restoration Act (RFRA) and early free exercise
            jurisprudence imposed the requirement that plaintiffs demonstrate
10          a "substantial burden" on their exercise of religion, those cases
            decided under RFRA and under the pre-Smith regime provide
11          some guidance as to the meaning of this pivotal, but open-ended,
            statutory term.  See Marria v. Broaddus, 200 F. Supp. 2d 280, 298
12          (S.D. N.Y. 2002) (adopting precedent interpreting "substantial
            burden" under RFRA in applying RLUIPA); Charles v. Verhagen,
13          220 F. Supp. 2d 937 (W.D. Wis. 2002) (same).  Under the case
            law, it is established that a substantial burden "must be more than
14          an inconvenience."  Bryant v. Gomez, 46 F.3d 948, 949 (9th Cir.
            1995) (quoting Graham v. C.I.R., 822 F.2d 844, 850-51 (9th Cir.
15          1987), aff'd sum nom. Hernandez v. Commissioner, 490 U.S. 680,
            699, 109 S. Ct. 2136, 104 L. Ed. 2d 766 (1989).  The Supreme
16          Court, however, has articulated the substantial burden test
            differently over the years.  See Lyng v. Northwest Indian Cemetery
17          Protective Ass'n, 485 U.S. 439, 450-51, 108 S. Ct. 1319, 99 L. Ed.
            2d 534 (1988); Thomas v. Review Bd. of Ind. Employment Sec.
18          Div., 450 U.S. 707, 718, 101 S. Ct. 1425, 67 L. Ed. 2d 624 (1981);
            Sherbert v. Verner, 374 U.S. 398, 404, 83 S. Ct. 1790, 10 L. Ed. 2d
19          965 (1963).

20          In Lyng, the Court declared that for a governmental regulation to
            substantially burden religious activity, it must have a tendency to
21          coerce individuals into acting contrary to their religious beliefs.
            485 U.S. at 450-51, 108 S. Ct. 1319; see also, Thomas, 450 U.S. at
22          717-18, 101 S. Ct. 1425 (holding that a substantial burden exists
            where the government "puts pressure on an adherent to modify his
23          behavior and to violate his beliefs.").  Conversely, a government
            regulation does not substantially burden religious activity when it
24          has only an incidental effect that makes it more difficult to practice
            the religion.  Id.; Thiry v. Carlson, 78 F.3d 1491, 1495 (10th Cir.
25          1996).  Thus, for a burden on religion to be substantial, the
            government regulation must compel action or inaction with respect
26          to the sincerely held belief; mere inconvenience to the religious

1    institution or adherent is insufficient.  Jolly v. Coughlin, 76 F.3d
2    468, 477 (2d Cir. 1996).

3    Guru Nanak Sikh Society of Yuba City v. County of Sutter, 326 F. Supp. 2d 1140, 1151-52 (E.D.
4    Cal. 2003).

5              RLUIPA is "the latest of long-running congressional efforts to accord religious

6    exercise heightened protection from government-imposed burdens." Cutter v. Wilkinson,

7    ___ U.S. ___, ___, 125 S. Ct. 2113, 2117 (2005) (holding that RLUIPA "does not, on its face,

8    exceed the limits of permissible government accommodation of religious practices"). In Cutter,

9    the Supreme Court noted that Congress enacted RLUIPA after documenting, "in hearings

10   spanning three years, that 'frivolous or arbitrary' barriers impeded institutionalized persons'

11   religious exercise." Id. at 2118.  The Court found that the Act "alleviates exceptional

12   government-created burdens on private religious exercise" and "protects institutionalized persons

13   who are unable freely to attend to their religious needs and are therefore dependent on the

14   government's permission and accommodation for exercise of their religion." Id. at 2121-22.  The

15   Court noted congressional anticipation "that courts entertaining complaints under § 3 would

16   accord 'due deference to the experience and expertise of prison and jail administrators.'" Id. at

17   2119.

18             In the present case, plaintiff has failed to meet his initial burden of coming

19   forward with evidence demonstrating a prima facie claim that defendants' policies constituted a

20   substantial burden on his religious exercise. See 42 U.S.C. § 2000cc-2(b); Warsoldier, 418 F.3d

21   at 994-95.  Plaintiff merely asserts that group religious services were necessary for "meaningful

22   worship," because "private" religious worship, is not "enough to satisfy a persons [sic] religious

23   needs." (Pl.'s P&A, at 13.)  This bare allegation by plaintiff does not demonstrate, or even

24   suggest, that there has been a substantial burden placed on his ability to exercise his religion by

25   defendant's actions.  Instead, the failure to provide group religious worship services for

26   maximum security jail inmates, appears to have only an incidental effect on the exercise of

16

1  plaintiff's religion.  Certainly plaintiff was not required to act contrary to their religious beliefs.

2  Moreover, as noted above in addressing plaintiff's Free Exercise claim, alternate means for

3  exercising his religion remained available to plaintiff.   While the jail policy with respect to

4  group religious services for maximum security detainees may have made it more difficult or

5  inconvenient for plaintiff to practice his religion, such action did not substantially burden his

6  religious activity.  County of Sutter, 326 F. Supp. 2d at 1151-52 (and cases cited therein).   Even

7  had plaintiff met his initial burden, defendant has established a rational connection between the

8  challenged policy and a legitimate and neutral governmental interest and has demonstrated that

9  any burden imposed on detainees furthered a compelling governmental interest in jail security

10  and did so by the least restrictive means.  Under such circumstances the court must accord due

11  deference to the experience and expertise of jail administrators.  Cutter, 125 S. Ct. at 2119.

12          Accordingly, defendant is entitled to summary judgment with respect to any claim

13  by plaintiff based upon RLUIPA.

14  III.  Plaintiff's Remaining Claims

15          A.  Equal Protection Claim

16          Plaintiff's opposition to defendant's summary judgment motion suggests that

17  plaintiff is attempting to claim that his rights under the Fourteenth Amendment were violated in

18  that maximum security inmates at the Claybank facility are treated differently than minimum and

19  medium security inmates at that jail with respect to access to group religious services.  (See Pl.'s

20  P&A at 11; Pl.'s Decl., at 3.)   According to defendant Rourk's declaration,

> Minimum and medium security inmates are permitted to use the
> classroom for group services, because they do not pose the threat to
> jail security that maximum security inmates pose.  Minimum and
> medium security inmates are housed in open bay day rooms in a
> dorm-like setting.  Because of the danger to jail security they pose,
> maximum security inmates are housed in two-person locked cells
> with 10 cells to a module.

25  (Rourk Decl. ¶ 7, at 2.)

26  /////

1    　　　The Equal Protection Clause, which ensures that similarly situated persons

2    are treated alike, applies to prisoners.  See Turner v. Safley, 482 U.S. 78, 84 (1987); Plyler v.

3    Doe, 457 U.S. 202, 216 (1982).  Thus, prisoners may not be subjected to invidious

4    discrimination.  See Lee v. Washington, 390 U.S. 333 (1968) (per curiam).  To prevail on an

5    equal protection claim, a prisoner must show that he or she was treated in a disparate manner

6    without a rational relationship to a legitimate state purpose.  See San Antonio School Dist. v.

7    Rodriguez, 411 U.S. 1, 40 (1972).  Proof of discriminatory intent or purpose is also required to

8    uphold a discrimination claim.  See Washington v. Davis, 426 U.S. 229, 239-40 (1976); see also

9    Freeman v. Arpaio, 125 F.3d 732, 737 (9th Cir. 1997) ) (stating that prisoner's equal protection

10   claim must show that officials intentionally acted in a discriminatory manner).  Discriminatory

11   intent may be proved by direct or circumstantial evidence.  See Lowe v. City of Monrovia, 775

12   F.2d 998, 1011 (9th Cir. 1985), amended on other grounds by 784 F.2d 1407 (9th Cir. 1986).[18]

13   　　　In order to establish a § 1983 claim based on the Equal Protection Clause of the

14   Fourteenth Amendment, plaintiff must show that defendant intentionally discriminated against

15   plaintiff or against a class of inmates which included plaintiff.  Here, as in all correctional

16   institutions, maximum security inmates such as plaintiff are treated differently than medium and

17   minimum security inmates.  However, clearly there is a rational basis for the different policies

18   based on the security classifications.  As discussed above, security and staffing concerns

19   provided a rational and legitimate basis for denying group religious services for maximum

20   security inmates while allowing such services for lower security detainees.  Therefore, summary

21   judgment should be granted in favor of defendant as to plaintiff's equal protection claim.

22   /////

23   /////

24   /////

25   _____

26   　[18] Conclusory allegations of discrimination cannot withstand a motion for summary
     judgment.  See Forsberg v. Pac. Northwest  Bell Tel. Co., 840 F.2d 1409, 1419 (9th Cir. 1988).

1    B.  Eighth Amendment Claim

2           Plaintiff next contends that by being denied the opportunity to participate in group

3    religious services, he was subjected to cruel and unusual punishment in violation of the Eighth

4    Amendment.  (Am. Compl., at 4.)  The claim is meritless.

5           It is the Fourteenth Amendment's Due Process Clause rather than the Eighth

6    Amendment which requires that pretrial detainees not be subjected to conditions that amount to

7    punishment.  Bell, 441 U.S. at 535-36.  Whether there has been a violation of the Fourteenth

8    Amendment is determined as follows:

9           [I]f a particular condition or restriction of pretrial detention is
            reasonably related to a legitimate governmental objective, it does
10          not, without more, amount to "punishment."  Conversely, if a
            restriction or condition is not reasonably related to a legitimate
11          goal - - if it is arbitrary or purposeless - - a court permissibly may
            infer that the purpose of the governmental action is punishment
12          that may not constitutionally be inflicted upon detainees qua
            detainees.

13

14   Id. at 539.

15          Here, defendant has provided a legitimate governmental objective to be achieved

16   by denying maximum security inmates access to group religious services.  Obviously, jail

17   security and effective management of the facility are legitimate governmental interest.  Id. at 540.

18   Plaintiff has not been subjected to punishment in this regard.  Accordingly, defendant is entitled

19   to summary judgment in her favor as to plaintiff's Eighth and Fourteenth Amendment claims.

20   C.  California Penal Code § 4027

21          Plaintiff argues that California Penal Code § 4027 guarantees that he be afforded

22   the opportunity to participate in group religious worship.  (Pl.'s P&A at 4.)  Penal Code § 4027

23   merely provides:  "It is the intention of the Legislature that all prisoners confined in local

24   detention facilities shall be afforded reasonable opportunities to exercise religious freedom."  The

25   court agrees with defendant that nothing in this statute mandates group religious services for

26   maximum security jail inmates.  As discussed above, plaintiff has failed to present any evidence

1   that he was denied reasonable opportunities to exercise his religion.  As noted, plaintiff was

2   provided religious materials and access to volunteer chaplains.  Therefore, defendant is entitled

3   to summary judgment as to this claim as well.

4   IV.  <u>Requests for Judicial Notice</u>

5               On September 27, 2005, defendant filed a request that the court take judicial

6   notice of plaintiff's amended complaint as well as the court's July 26, 2004 order determining

7   that plaintiff's amended complaint stated a cognizable claim for relief.  On November 21, 2005,

8   defendant filed a second request for judicial notice of documents filed by plaintiff and other court

9   orders to which defendant attached to the request.  On November 16, 2005, plaintiff requested

10   judicial notice of defendant Rourk's declaration which was filed with the court on September 27,

11   2005.

12               All of these requests for judicial notice will be denied as unnecessary.  The court

13   need not take judicial notice of orders or documents filed in this action.  In addition, defendant's

14   request for judicial notice of plaintiff's documents will be denied because defendant does not

15   refer to these documents in his motion for summary judgment and provides no explanation as to

16   why judicial notice is sought.

17               Accordingly, IT IS HEREBY ORDERED that:

18               1.  Defendant's September 27, 2005 and November 21, 2005 requests for judicial

19   notice are denied; and

20               2.  Plaintiff's November 16, 2005 request for judicial notice is denied.

21               Also, IT IS HEREBY RECOMMENDED that:

22               1.  Defendant's September 27, 2005 motion for summary judgment be granted;

23   and

24               2.  This action be dismissed.

25               These findings and recommendations are submitted to the United States District

26   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

days after being served with these findings and recommendations, any party may file written

objections with the court and serve a copy on all parties.  Such a document should be captioned

"Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

shall be served and filed within ten days after service of the objections.  The parties are advised

that failure to file objections within the specified time may waive the right to appeal the District

Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

DATED: July 21, 2006.

_Dale A. Drozd_

DALE A. DROZD
UNITED STATES MAGISTRATE JUDGE

DAD:4
greene917.57

21